22-21-19 22-35-61 Robert Parker et al. versus Battle Creek Pizza Incorporated et al. and Michael Bradford versus Team Pizza Incorporated et al. Oral argument as follows, 20 minutes for the plaintiffs, 20 minutes to be shared by the defendant. Arguing first, Ms. Cooley for the defendant's appellees. Good morning. Good morning and may it please the court. My name is Lauren Cooley. I represent Team Pizza, the appellee in the Bradford matter and with me is Jeff Garrish who represents the appellant in the Parker matter. I'd like to reserve two minutes for rebuttal, please. Alright. Are you both covering the waterfront? We are, Your Honor. I would ask this court to affirm in Bradford and reverse in Parker for two reasons. First, the law gives us an answer here. A reasonable approximation of actual expenses satisfies the FLSA and is deemed to fall outside the wage calculation. All the signposts in the statute and the regulations lead to this answer and it is not genuinely ambiguous. Second, even if you were to find that ambiguous, the only way to the IRS rate is to not only disregard the answer in the regulations but also to disregard the agency's official position on what the regulations mean and to then adopt as binding a distorted interpretation of an operations manual the agency itself says is neither an interpretation nor their interpretation of the governing regulations. Turning first to the plain meaning, I will start with a point that goes largely unanswered in Bradford's brief and that is the statute itself. The FLSA itself says that reasonable payments for employee expenses on behalf of an employer are outside the wage calculation for both overtime and minimum wage purposes. Well, I thought that language was only in the part that speaks toward reasonable rate or the employees. What's the term with rate? The regular rate? Yeah, regular rate. Thank you. Your Honor, I point you to 207H which is part of the statute, not only the regulations, and it says that the sums that are excluded from the wage calculation from regular rate overtime are also excluded for purposes of the minimum wage. Right. I mean, I do think those are two different contexts that, I mean, you agree that you must pay, the companies must pay these drivers $7.25 an hour. That's just a categorical obligation. Fair? Yes, Your Honor. And it would seem to me that the free and clear reg is a completely sound interpretation of the statute. It's really almost something you'd get as a judicial holding in an early case interpreting a statute where somebody has to provide tools, where you know obviously they can't be forced. Someone who's getting actually paid $7.25 an hour as a wage can't be forced to bear an expense bringing tools to the job. Right? Agreed, Your Honor. And $0.10 on the dollar, that person should be reimbursed. Is that fair? That is fair, Your Honor. What I think that the statute and the regulations are addressing is a scenario like this where an actual expense can't be known with exact precision. And in that scenario, the answer that the Department of Labor and Congress have adopted is this reasonable approximation standard. And so that is deemed to satisfy. I get that. But the statute says $7.25 an hour. The statute has just a very clear categorical mandate that you must pay them $7.25 an hour. So let's say an employee can come in and show that a reasonable payment is actually an underpayment. The company would owe that person money, correct? If a reasonable payment was an underpayment, would the company owe them money? Not necessarily, Your Honor. Why? I mean the statute says, actually spells out the number the company must pay. But then the statute also concludes that a reasonable payment is not compensation and the general rule for reimbursement is... For purposes of determining whether the person's being...it's complicated because an overpayment would...I mean, I think the provisions you're pointing to are anti-manipulation provisions for purposes of determining reasonable rate for overtime, on the one hand, and also for purposes of determining minimum wage on the other. Your question could...two points. One, Your Honor, your question could go more toward whether the approximation is reasonable and to what extent that has to... What if, I mean, let's say it doesn't have to be such an approximation, you know? I mean the person comes in with gas receipts, oil change receipts, and brings you a printout from Kelley Blue Book saying, you know, I drove my vehicle for 300 miles and depreciation is X according to that measure. There's really not a lot of guesswork. There is where you have mixed use, where you have an employee driving their vehicle for both personal and business use. Right, right. So they are exactly apportioning... It's easy to tell how many miles they drove delivering pizzas. That's correct. I mean, I just...I don't think this is like a totally unknowable number. And if the employee comes in and shows more precisely that he's being underpaid, I can't see how anything in the statute would override $7.25 an hour in A1C. Two responses, Your Honor. First, if the employee...that would be a tremendous burden on the employee to require them to keep receipts of all of their gas transactions. I'm just saying if that person...well, if they're getting paid $0.20 a mile, it might not be that hard to show that's wrong. But let's say they do. If they were to prove that the mileage rate adopted by the company was improper because they were actually incurring greater expenses, then that would be a question of the approximation being unreasonable or that they showed actual expenses. If they could prove how their maintenance fees, et cetera, fees were allocated between personal and business fees. But I want to point to one other. You mentioned the minimum wage rule. There's also an overtime rule in the statute. And the DOL is trying to thread the needle. Overtime is concerned with not allowing for over-reimbursements. The I-ante kickback rule applies to overtime as well. And if the reimbursement is allowed to be excessive, what happens is the calculation of the overtime rate is depressed. So if compensation is hidden in reimbursements, what the employer owes in overtime is too little. So the DOL is threading both statutory directives here. And the reasonable approximation is what threads that needle fairly on both sides. The other side concedes that the I-ante kickback rule applies to overtime. And it concedes that the reasonable approximation standard applies to that, to overtime. So what this position amounts to is requiring two inconsistent different standards for satisfying the I-ante and satisfying both statutory directives. Why isn't the IRS rate not a reasonable approximation? It could be a reasonable approximation, Your Honor, but it's not the only one. And the DOL explains that in its official position. The only way the IRS rate is construed as the only alternative is if we disregard what the DOL says, its official interpretation, and adopt what is in an operations manual that says it is not an interpretation of the regulations and give binding weight to that interpretation. There's no precedent for doing that. Your Honor, I'm relying on the DOL opinion letter. Is your position that the regulations or the statute is ambiguous? Our position is it's not ambiguous. But if it is, you have an opinion letter which tells us what the DOL's official position is. And under Kaiser, where an agency disclaims a position as not interpretive, that is not entitled to Kaiser deference. We have that here in two ways. One, the operations manual on the first page says it's not to be used for interpretive guidance. And the particular provision here says it's an enforcement policy, not an interpretive policy, and includes no reasoning. But wasn't the opinion letter sort of in response to the litigation that was coming out? That may be true, but that's often true for opinion letters. And it still states itself. The DOL could have said whatever it wanted. And it provides what it says. It's an official and authoritative position. So to disregard that and then to elevate a non-interpretation and distort that operations manual and give it binding weight, there's no precedent for doing that. The other language, I would also point out that the two DOL statements, the operations manual and the opinion letter, are consistent with each other. The operations manual speaks in terms of a discretionary standard that may be used in lieu of actual costs as an enforcement policy, essentially a safe harbor. So when the IRS rate comes, receives a complaint, and comes and evaluates an employer, they can look at and compare what the employer is using to the kind of inputs that are used in the IRS rate. It's a benchmark. It's a data point. But it's not the only one. If it was, we would expect not only the operations manual, but the DOL opinion letter and the guidance themselves to say this is the only method. There's no other alternative. This method shall be used in lieu of actual costs. We have none of that language here. And we have no reasoning in the operations manual, no citation to the rules, no interpretation that would be afforded, even persuasive weight under Skidmore. And even if it is a choice that the DOL could make, they would need to go through the process of issuing an opinion letter, which hasn't been withdrawn, or amending the regulations, which we think are unambiguous on this matter, in order to get to the IRS rate. So the other side has a number of obstacles to overcome in order to set aside the reasonable approximation standard and require only one alternative to actual costs, which makes sense where you have nationwide variability in vehicle costs, where you have regions within the Sixth  I don't know when you're going to pause. I apologize, Your Honor. But if we decide that the statutory guidance is sufficient along the lines being suggested by Judge Kethledge, and we're not concerned about ambiguity because that doesn't really enter into it, then at that point we're not concerned about regulatory guidance or opinion letters and these other things that are supportive of your position. If we think that we can address this with the guidance of the statute, then that's the end of the discussion, isn't it? I agree, Your Honor, yes. Okay. All right. I guess you're out of time. Thank you, Your Honor. Good morning. May it please the Court, Jeff Garish, on behalf of the defendants and Parker, I also would like to reserve two minutes for rebuttal. There are several fundamental reasons why employers are permitted to reimburse expenses by reasonably approximating the amount expended. The regulations specifically say as much. The Department of Labor has explicitly said the regulations say as much. What about the statute? You have to pay $7.25 an hour. I think Judge Clay was just alluding to this. You must pay $7.25 an hour. But the statute... Where I have a problem is where the employer supposedly reasonably approximates. The employee comes in and says, you know what? In my individual case, your reasonable approximation is an underpayment. I'm entitled to $7.25 an hour, which isn't a princely sum under the statute. And I'm having a hard time seeing how the employee isn't right in that instance. And, you know, it doesn't have to settle for this reasonable approximation. Well, the employee may be right that an approximation done by an employer in a given case isn't reasonable because it underpays the employee. But the mere fact that an approximation is not reasonable doesn't mean that that standard is not one that can be used, as the regulations say and as the DOL itself has said. There's nothing in the statute that prohibits employers from using a reasonable approximation. That's why the regulations are important and the 2020 DOL letter that specifically says they can do that. Well, I mean, so what's the import legally then of a reasonable approximation if the employee or a group of employees in a case of a systematic underpayment can come in and show that it's wrong? Is it just sort of a, you know, first stab at the correct number? Well, employees certainly have remedies. If they're being underpaid, they can come to the employer and they can complain that they're being underpaid and the employer is faced with potential retaliation claims and they're going to have to deal with that. They can also file suit. They certainly have plaintiff's counsel that can bring suits, even collective actions potentially in this area. None of this goes to whether they're... I have a question on that. If the reasonable approximation takes the employee below the 725, what happens then? If a reasonable approximation, if it can be shown that it's less than what's actually owed, it seems like it's a compelling argument that it's not a reasonable approximation and there's nothing that prohibits an employee from proving that there's no reasonable approximation. But none of this goes to whether employers can use this. And this is also the only practical way that it can be done. Judge Kethledge, as a practical matter, it is impossible to keep actual expenses. There's no duties for employers to track them. There's no way an employee can track expenses because they would never be able to ascertain how much wear and tear... But I think we ought to just put this in context. I mean, nobody's forcing Domino's Pizza to require their drivers to provide a vehicle. Domino's, and they do in many places, they could provide their own vehicles and spare themselves this great administrative difficulty. Or they could not cut it so close. They could not pay somebody, you know, sort of a nominal wage of 725 an hour and then give them the sort of reimbursement numbers that they seem to be giving them. You know, I mean, just give yourself a bit of a buffer, you know, and you're saving administrative costs by doing so. But if you want to cut it to the bone on both scores, then it would seem like the company is open to somebody coming in and saying, you know what, my car gets less good gas mileage than this other person's car and 21 cents a mile doesn't even come close to cutting it. Somebody could make that showing. Well, they could potentially make that showing, but I think in the industry they're not cutting it as close as you might think. In our case, the Holland expert showed that they were not cutting it that close. They were paying in excess in every case. And their argument is that the employers are required to use the IRS rate. They have no support in any regulation. I'm not talking about that. I mean... But there's only... I'm not... And so some of these folks were paid per delivery and some, somebody was getting like 21 cents a mile. Well... So, you know, if somebody... Well, whatever, I mean, people can litigate whether that is actually reimbursing people's costs. And whether it's reasonable. To me, there's no way to do it other than by a reasonable approximation. The IRS rate itself is an approximation, but it's a national scale. And it's also based on new vehicles, the most popular vehicles, and on the assumption that all scheduled maintenance is done. That is not typical of police delivery drivers. As our record showed, the drivers tend to drive... I guess my point is, I understand the administrative difficulty, but we only end up in this courtroom when somebody cuts it close enough that people think they are being underpaid. Well, if people can... It's not that hard to avoid this situation. I think if people can be convinced by a plaintiff's counsel that they're being underpaid, you can end up in court. But the reality is, Judge, these people are making very good money. They're making two to three times the minimum wage. In some of the stores that... I mean, if that's so clear, why isn't this an easy case? Because, well, it's an easy case because there's, reasonable approximation can be done. That's what the regulations say. That's what the Department of Labor says. I'm looking at a statute that says $725,000, and it's just as unequivocal as it gets. But that doesn't address whether or not employers can make reasonable approximations when keeping track of actual expenses is impossible. That's the problem. And the IRS rate is not the solution. There's no authority that the IRS is required in any statute, reg, or statement. All right. No, I appreciate your arguments. Thank you. Good morning. May it please the court, Matthew Wessler for the Appellees. I'd like to pick up, Judge Kethledge, on, I think, maybe the focus of some of your questions, which is that, of course, you're absolutely right that Section 206 in the statute sets this categorical floor, it's $725,000. And you heard the other side get up and say, well, there's this other section in 207, which we think somehow affects that interpretation. But, of course, 207 is an overtime statute. It's not a statute that governs minimum wage. And I think... Well, there is the 207. I mean, as Ms. Cooley said, I mean, there is the 207-H, I think, that says, what, it uses the term reasonable payments? Yes. And those do not count toward paying the person minimum wage, right? That's correct. But the gravity of all of 207, including 207-H, is, as I think you suggested, the regular rate, which is also the focus of the Section 778, which is the provision that the defendants have asked you and the 2020 opinion letter asks you to take as controlling for whether a reasonable approximation standard somehow applies to the calculation of minimum weight when it comes to the free and clear regulation. And I think the same problem affects that interpretation on the statute side and on the regulation side, which is 778, like 207, exclusively refers to rules that apply when it comes to the calculation of the regular rate. It says nothing about how to calculate the costs when an employer is trying to establish compliance for minimum wage requirements under the free and clear regulation. And that's true at a macro level for 778. If you look at the first provision of 778, it discusses regular rate. The title of the section involves the calculation of the regular rate. Yeah, it refers to minimum wage, H1 does. It refers to wages paid under Section 206. Yes, which is another way to say that you can't be doing the same kind of excludable costs are also excludable when it comes to the minimum wage. But what it doesn't say is how to calculate those costs. And what the 2020 opinion letter tries to do and what the defendants try to do is to say, well, you can discern how to calculate those costs by looking at Section 778, the regulation. And the problem with that interpretation is that 778 doesn't in any way refer to minimum wage at all. It only refers to the regular rate. It's only an overtime regulation. And it only addresses situations that come up in the context of how to calculate the regular rate. In other words. The regulation that tells us to look at 778. Sorry? What do we do with the regulation that cross-references? Sure. So the way that the defendants and this 2020 opinion letter get to 778 is through this series of daisy-chained cross-references. 531.35 refers a reader to 531.32c, which then refers a reader to Part 778. Now the theory for the government, the DOL in this 2020 opinion letter and the defendants is that those cross-references incorporate entirely the substance of 531.32c and then in turn Part 778. But if you actually look at the text of those cross-references, they don't do what the defendants say they do. One of them uses the phrase see also. The other uses a phrase in connection. Which as a matter of just textual interpretation doesn't mean the whole substance of the regulation gets imported into the previous one. It's used as an informative effort to convey to readers that there are other rules that they should be paying attention to in the same or similar context. And I think you can tell that that's true based on what these other regulations do. So for instance, 531.35, which is the free and clear regulation. It controls or governs a very specific kind of situation when a worker is forced to cover the cost of certain tools of the trade. But 531.32, which is the first cross-reference regulation, doesn't address that situation at all. The only thing it addresses is what to do in the case of an employer who's covering the cost of certain tools of the trade. And then... That one says C778.217. It does. And right preceding that cross-reference, Judge Kethledge, the actual provision that is where you see the cross-reference, the regulation takes a position. It says unlike certain worker, excuse me, unlike certain employee covered tools, meals are for the benefit of the employee. And so they are not governed by 531.32C. But then there's the cross-reference. And the reason there's a cross-reference there is because that isn't actually true in certain overtime contexts. If you go to Part 778, what you see is that meals and travel expenses when a worker is traveling out of the city, away on business, on the road, is actually controlled by a different rule. That's a term of art, right? I mean, that's like truckers, not delivery drivers. You know that both because of the definition of that term and also in the regulation itself, it's in quotation marks. So when the agency was promulgating that regulation, which was a while ago, we don't see this term used very often anymore, over the road or on the road was a term of art that meant basically it was used a lot in the trucking industry when compared with line truckers, a worker who is traveling away from their home and as a result is forced to, for instance, stay in a hotel or a motel or eat meals on the road. And in that situation, the rules are different. But none of that, whatever the rules that might apply in the overtime context, whatever the rules might apply when you're dealing with an employer who's covering certain tools, none of that relates at all to the subject of 531.35, which is the actual regulation at issue in this case and involves an entirely separate situation where an employee is being forced to cover the cost of tools. Now, I think, I mean, you heard the questioning of your friends on the other side. And so the statute says 725 and, you know, one could argue that it's a categorical rule that the employee cannot be shorted that amount when he has to provide tools. And so if the employee can demonstrate that he got shorted, then he would have a claim under this line of argument. Now, from that line of argument, I really have a hard time seeing how we end up with the IRS regular rate as a legal requirement. So I guess I just want to understand, I mean, is it your position that there is some law here that actually requires payment of the IRS regular rate in order to satisfy the statutory mandate here? So we think there are two ways. Is the answer yes to that or no? I think the answer is yes. Really? Yes. Okay. Here's why. Explain to me how we do that. So Section 206 is, there's not much there. But the key term, other than the categorical floor, 725, the key term is wages. Okay? Wages isn't defined in the statute. It's not given a term. It doesn't tell anybody what's included or what's not included. Okay. I mean, well, we have precedent, I know because I wrote it, saying just because a term isn't defined in a statute doesn't mean it's ambiguous for the same reasons that we're, like, able to understand each other right now. Understood. Wages, I mean, is it your position that wages is ambiguous? Well, we think it's not. Unknowable term? We think it's not. It's not ambiguous because Section 531.35, the free and clear regulation, clarifies. Well, wait a minute. Wait a minute. I mean, you know, I mean, we construe statutes all, every day. Are you saying that wages, as, you know, looking at the statute, that judges can't determine what wages means? Well, I think judges can determine what wages mean. But I also think the agency is entitled to make decisions about which tools of the trade, for instance, are covered within that definition and which are not, which is the whole Section 531.1 through, you know, 42, sets out rules about, okay, these certain tools are, have to be included within the calculation of wages. Well, there's, you know, everybody knows that, you know, when the person brings their vehicle to deliver the pizzas, you know, that's, that's, they're providing tools. Nobody has, has any doubt about that. So, we've got to get, let's not worry about wages. $7.25 an hour. Yep. Right? Yep. And so how is it that they have to pay the IRS rate as, like, there's a legal mandate for that too? That's where I'm, I don't see any of that, but. Well, I understand, I understand your discomfort. I do think that without the regulations, without what's in Section 531, one wouldn't know from that statute what kinds of tools are potentially covered as part of wages and which are not. Nobody's, nobody's disputing that these vehicles that they're using are tools. It's just not at issue here. It's just how much, how much cost are they bearing to provide the tools for their employer, right? I understand that, but the reason no one's disputing that is because the agency has promulgated a regulation making that clear. Well, I think we would have figured that out anyway, but go ahead. Well, so, I mean, I understand your position. I do think that without any definition of tools of the trade, there would be disputes about, you know, is this particular tool a uniform, for instance, does that count? Well, let's move farther down your explanation as to how this IRS rate somehow is required. Sure, so 531.35 contains this term costs, or it's actually singular, costs. Right, right. Now, do you really think that's ambiguous? We do, your honor. I mean, really, come on, it's just, you know, what the monetary expense, ultimately, that the person has to bear. Well, I think what you're describing would be actual cost, I think, and the regulations themselves, as opposed to an estimated cost. Okay, well, let's say I agree with you on that, hypothetically. Okay, great. Let's, and then you just figure out what that is. Well, I mean, if you, so you argue that cost, and we have an amicus brief that argues that the term cost is ambiguous, that it's a, you know, judges look at this, and it's a 50-50 equilibrium, and we can't figure out what that means. I would suggest that we're mixed up in where we are in the IRAC analysis here. Like, the R is what the statute means, and cost, I mean, it's a reg, but it's a totally sound interpretation of a statute. Cost is, cost is easy. Okay, the legal meaning of cost is easy. What's hard to ascertain are the facts, and that's the A. That is not an interpretive matter. It's a matter of just finding the evidence that tells us what the facts are. What's, I mean, what's wrong with that? Well, a couple of responses. First, I disagree that we're at the R of the IRAC. Why? I do think that costs can mean either actual costs or estimated costs, and when. You say actual. What, sorry? You say actual costs? We, one or the other. I don't think it's defined in the regulation, and so I think the problem. The statute says 725. That's the number that must be met. Right. Right? Right. I thought you sort of agreed that, or were saying that an estimation doesn't work if it's short of that, which, and it also would imply that an estimation isn't necessary when it's way above that, or above it, period. Sure, but I think what the agency has done when it comes to this question of how do we figure out an estimated cost within the vagueness of that term, is they've supplied an answer in the handbook, and they've said, as an enforcement matter. As an enforcement matter. Correct. Not an interpretive matter. Correct. That's what the. Why are we deferring to this interpretation? Well, under Kaiser, just because it's an enforcement position doesn't make it any less authoritative than any other position. I think this is actually sort of the key lesson that I'd urge the court to draw from Kaiser, which is that what Kaiser says is when there's an ambiguity in a regulation, and an ambiguity doesn't necessarily, it isn't some narrow term of our understanding of ambiguity. It can mean vague. It can mean that the regulation doesn't specifically address the issue in the right context. The agency is entitled at that stage to develop an interpretation that is entitled to deference if it's authoritative. And authoritative doesn't mean that the agency has to come up with some broad-reaching policy. It means, is the interpretation binding in some way? And if you look at what is in the handbook, that is binding. It says you have two choices. It says as a general matter up front, we are not interpreting anything. And then as to the very IRS rate provision you're talking about, it reiterates, as to this, we are not interpreting anything. This is just how we're going to exercise our enforcement, i.e. prosecutorial discretion. And yet courts must defer to that as an interpretation? So a couple of responses. Okay, go ahead. So first of all, courts have given deference, especially our deference, to enforcement positions in all sorts of contexts. So I must defer to this. It's telling me we're not interpreting, but I must defer to this as an interpretation in this case. Correct, Your Honor. We think that's the consequence of our deference if the interpretation is authoritative, if it's longstanding. How is it authoritative when they're not even purporting to interpret? Well, a binding enforcement decision is authoritative. It tells... They're talking about when they will forbear. We're talking about forbearance here. They're saying we will not go after you if you pay this. That's the opposite of a decision to enforce, which seems to be what you're referring to. I don't think that's quite right. But even if I was unable to persuade you on that, the next section of the handbook, which is a separate section, makes the same point without actually using that enforcement language. So I think either way, even if you were to be unpersuaded by the fact that one of them says it's an enforcement position, the second provision in that chapter of the handbook says you have two choices. That position is authoritative, doesn't refer at all to enforcement, and is consistent with the way that the agency has understood this problem in other contexts. Let's just take uniforms, for example. The same problem arises when it comes to uniforms. We can either reimburse the actual cost of uniform or, in the absence of records, what the agency did in the handbook was identify a specific rate. You can use this rate to satisfy your obligations under the free and clear regulation. That's exactly the kind of interpretation that is and has been entitled to deference. Other courts, when considering this question, have given the handbook's positions our deference and have deferred to it. Well, you answered my question on that point. OK. Let me ask you another question. I mean, here we have a statute that says $725, and the employee can't be forced to bear cost to provide tools. I mean, this is, you know, that seems like a very straightforward statutory slash regulatory standard that we're applying here. Let's say we just say it's that simple. You got to pay the person $725, and you can't make them bear actual cost that would reduce that number. It's just that simple. OK? What is, I mean, what does this litigation look like if that's the regime? It's not this IRS thing is required, and neither is it if they take a reasonable stab, the employee loses. I mean, I'm, you know, you're obviously very knowledgeable about this sort of litigation. What does this look like, do you think? I think there's an easy version and a difficult version. An easy version is if there are actual records. But it doesn't happen very often because it isn't actually that easy for employees to keep these records. I understand that. So I think the difficult version, which is I think why, I want to answer your question, but it's I think why the agency stepped in in the handbook 20 years ago to supply a framework for answering this question. The difficulty is when there are no records. And at that point, figuring out how to reconstruct costs without records is not easy. It might involve experts that are battling it out. The administrative costs to that kind of litigation are significant. And I think the point of all of that is that what the agency tried to do 20 years ago with the handbook was supply an approach that was easily administrable, that provided clear rules, and that allowed everybody to know what their obligations are for complying with this free and clear regulation. Now, I understand your hesitance to defer to that position. But with respect, it is exactly the kind of position that I think we should expect and want agencies to be making because they're the ones with the expertise about the difficulties in establishing compliance with 531.35. And they came up with a reasonable framework for how employers can do it and how employees can understand whether or not they are getting the wages that they are entitled to. And in the absence of that, by refusing to defer to the agency's longstanding view about this, I think the risk is that a court injects itself into a particularly thorny problem that has already had a solution for a long time. I mean, that number, so, I mean, let's just posit for a moment that the agency is not telling us what cost means. It's giving, in the view you just described, it's giving us sort of a suggested standard for what costs are, but not what cost means, okay? You know, like, this is what we think would usually be the cost for somebody who has to drive their own vehicle for work. It's not what cost means. It's here are the dollars and cents that person is typically going to be incurring in the world, you know, based on our knowledge about what happens in the world, such as to the extent agencies have that. And I guess, I mean, how is that really very useful when it's a one size fits all thing for, like, the whole country? I mean, you've got pizza delivery drivers in Omaha, and you've got some in, you know, New York City, and, you know, places like that. And so how is this, I mean, I understand your point, and it's a problem, but how is this number in particular all that useful? Well, again, I think we leave it to the agency to make that call. I mean, I think if I leave you with nothing else, I think it's this, that the agency... It's arbitrary, though. Well, no, I think that, so I think we leave it to the agency. I don't think it's arbitrary. I think what the agency did here was it didn't pluck some number at random. The IRS reimbursement rate, this is a standard mileage rate. If you go and you look, publication 917, which is, you know, it's a 30-page document that I didn't even, I mean, I had no idea, and I realize I'm out of time. If I could just answer... If you could finish up. ...Judge Kethled's questions, it goes through in painstaking detail how costs when it comes to vehicles should be calculated, and then identifies this standard rate as a way to measure it in the absence of going through in that painstaking detail. So I don't think it's arbitrary, and it's exactly the kind of question... Mike, when you look at geographic differences, it does start to look arbitrary, and then people have different expenses based for different cars, and boy, I mean, this is a really ham-fisted way of trying to do this. But I understand your point. I mean, you think you can't do this in litigation? Is that what you're saying? I think it would be exceedingly difficult, yeah, and I think... I mean, the variables aren't that hard. Depreciation, what, you know, if somebody gave you a crazy mileage reimbursement, is it really that hard to show that at least that's not right? I understand. I do think, I think in most cases, records aren't kept, and the absence of records means that this question becomes fraught at the discovery and the proof stage, and I think the administrative difficulties in doing it one way or the other are significant. I respect you. Thank you. Thank you. I appreciate your arguments. Thank you, and we have Rebella. Thank you, Your Honor. Let's say I drive a Jeep Wagoneer to deliver pizzas. It's brand new. I submit that mileage reimbursement as actual expenses. What Congress contemplated in 207H and E2, and what the agency contemplates in the Reasonable Approximation Standard is that a reasonableness standard is appropriate here, that where actual expenses either can't be known exactly, or where an actual expense isn't reasonable, a reasonable approximation is appropriate. Do you think it's not reasonable for somebody to be driving a new vehicle? Not necessarily, Your Honor. Is that what you're implying there? What I would suggest is that if I were to use a car that, and I were to get, you know, the fanciest tires, and I were to try to attribute that to what is necessary for the job, that that would be unreasonable, that it would, that the employer wouldn't have to pay for a reasonable approximation. I mean, the employee is not forcing his vehicle on the employer. The employer is forcing the employee to use his vehicle. And it's sort of like you take your plaintiff as you find him. It's like you take your employee as you find him. You don't want the guy with the new Wagoneer, don't hire him. But if he's giving you expenses based on his Wagoneer, that's the tool that you told him to bring. But Congress said, used the phrase reasonable payments, adopted an objective standard. In the regular rate determination. And the regular rate determination is also what, and Congress has also said that the same exclusions from wages that apply to the regular rate apply to the minimum wage. Let's just say I disagree with you about that daisy chain of reasoning. Then you have to pay the person the actual cost, right? Another way to interpret that would then be that. Right? I mean, you have to pay them the actual cost then. You're right, Your Honor, but where the actual cost is not exactly known, Congress has provided a way to navigate that and so has the agency. The general rule in the expense reimbursement rule is framed as a general rule and it says it applies to any hours in the work week. It doesn't say overtime, it says any hours. So, Mr. Wessler makes the point that it's hard to determine what these costs are. If the employer is making the employee bear this cost, if you want a job here, you're driving your vehicle. I'm not buying a fleet of vehicles, you're driving your vehicle, I'm paying you $7.25 and I'm going to estimate kind of what your costs are. If that's the regime the employer is foisting upon the employee, why shouldn't there be like some prophylactic rule for determining the amount of cost that puts the burden on the employer who's foisting the regime not to underpay the employee rather than make the employee, you know, sort of bring this sort of litigation to get his $7.25 an hour? The employee has other options. Mr. Garrish mentioned the anti-retaliation provisions that essentially require the employer to respond. They can also file a complaint with the Department of Labor which is often how these cases proceed. The Department of Labor can come and investigate. You know, I mean, somebody's delivering pizzas, it's a pretty tough road. I'm going to go to the Department of Labor. I mean, if the company wants to do this, why not just put the burden on the company? There's nothing in the regulations or the statute that puts the burden on the company. The plaintiff has the burden of proving a minimum wage violation here and that is not the way the regime works. And as a practical matter, the companies are using technology often. There's a company called Modus referred to in the amicus brief here that can more specifically tailor the rate and be more accurate which threads the needle between the overtime and minimum wage policy and statutory directives that we've discussed. So again, the IRS rate in particular is not a reasonable answer to this problem. I see that my time has expired. I appreciate your time and we'd ask for you to affirm the Bradford. And Mr. Garish. Thank you, Your Honor. The plaintiff's argument is based entirely on a single clause in the field operations handbook that did not even purport to interpret any regulation or any statute. The 2020 Department of Labor letter did. It interpreted the regulations and it interpreted the statement in the handbook and said employers are entitled to use reasonable approximations. The reason they did that is because it is impossible, literally, to track actual expenses. And the reason the IRS rate doesn't apply is multiple. It's a national rate. It doesn't apply to different jurisdictions and to all vehicles. It would be a bad regime if these numbers are impossible to figure out and the employer can force the person to drive his vehicle. And I'm not saying it happened here, but low ball the cost number, which is so hard to figure out. And then somehow, you know, the young person or whoever it is who's delivering the pizzas has got to figure out how to get his, you know, dollar an hour that he's getting shorted. I mean, if that's the regime, that's pretty tough. But that's not what's happening, Your Honor. Even in instances where employers are furnishing their vehicles. Let's say it was. You know? I mean, let's say that happens at some store. I mean, it's just you have to go to court and it's your burden of proof. Is it that simple? Or could there be some prophylactic rule here that kind of, you know, puts the burden on the employer to be reasonable? Well, there's no basis for imposing the burden on the employer. The only argument they have, the only thing they need this court to hold is that the IRS rate is mandatory. They have to say that because the Department of Labor has said specifically that reasonable approximations work. And the entire industry has relied on the Department of Labor's 2020 letter, both before and after. That letter reflects the longstanding practice of employers using these drivers. The employers have relied on the very agency that makes the rules. That's the. I want to wind up there since you're red light. And it would be a terrible idea to require the IRS rate because these jobs would be gone. And these are good paying jobs. There's a reason why these people use their own cars rather than company cars because they're making very good money. And I see that my time is up. I apologize. Thank you very much. Thank you. And the case is submitted.